May I remove my mask? Thank you. And I would remind counsel that for the live arguments that we will be wiping down the podium and the microphone between every speaker. May it please the Court. My name is Shelly Mackel. I represent Jennifer Westlake, Lori Kelly, and the City of Des Moines. I have reserved three minutes for rebuttal. We're going to be talking today about qualified immunity and state immunity for law enforcement. And as I begin my statement of facts, I just want to note that I'll be referring to the child by first initial, which is L. On October 15th of 2018, Robert Rushing, who is the paramour of Trenisha Webster, beat L with a belt. She was seven years old at the time. The next day at school, she sought to see the nurse because she was in pain and wanted ice for her injuries. During that interaction, the nurse learned that Robert Rushing had beaten her with a belt. Usually it's mom, Trenisha Webster, who beats her with a belt, but mom hadn't been feeling well the night before, so that's why dad did it. And she showed the nurse the marks on her legs and showed the nurse old marks that she had gotten when her mom had beaten her. So the nurse called the Department of Human Services and made a child abuse report. And a child protective worker went to the school and interviewed L and learned consistently the same things from her, that dad did the beating last night, mom usually does, she had marks, and she has had them before. And so the Department of Human Services opened a child abuse investigation. And when they did that, they did a background check on Robert Rushing and learned that he had criminal convictions, including two domestic assault convictions against Trenisha Webster. And so they decided to go to the family home to speak with Ms. Webster and Mr. Rushing, and also to observe, because there was a one-year-old child in the home, to see if that one-year-old child was safe. When they arrived at the home, Ms. Webster responded by stating that she would raise her children the way she pleased. Mr. Rushing pulled her back from the screen door, they closed the door, and terminated the interview. So at that point, that's when our officers get involved. The Department of Human Services reached out to the police department, the Family Conflict Unit, and Lori Kelly and Jennifer Westlake were assigned to accompany DHS to assist them with their investigation. And this is permitted in Iowa Code 232.71b, which states that a law enforcement officer is supposed to work essentially in tandem with a child protective worker in a child abuse investigation. And child abuse investigations necessarily require actually seeing the child, creating or having a, you know, actually viewing the child. Does it include the right to enter the house without a warrant or exigent circumstances? It does not. And the statute that describes what can be done during a child abuse investigation that, you know, I think of the initial statute that I cite as sort of the enabling statute that says you can help with these investigations. And when the investigations are detailed, it says that there is an evaluation of the child. The DHS worker shall do an evaluation of the child. But it also says that if a parent chooses not to terminate or to not do an interview, they have that right. The statute also says that the parent can refuse to allow them in the home, at which case they need to go to the court. It does not contemplate that you cannot produce the child. There's nowhere in the statute that says that that's something that the parent can do. And I think... Run that distinction by me again. I'm not sure I picked up on that. Okay. So in the statute that explains what a child abuse assessment looks like, it says the child protective worker shall do an evaluation of the child. Then it says that a parent can refuse to engage in an interview of their own. And that essentially occurred here. Is that correct? Yes. That occurred here. Well, actually, she did an interview. She just, you know, she did not speak to them. And so, and the third is that they can refuse, a parent or caregiver can refuse to allow the child protective worker inside their home. But nowhere in the statute does it say that they have the right to not produce the child. So are you saying that that trumps the Constitution? The silence of a statute trumps the Constitution. I mean, that's the way I would see it too, I guess. I don't think it trumps the Constitution in the sense that, I mean, they're not asking to go into the home. They're not asking for Trenisha Webster, forcing her to participate in an interview. They're asking a parent to produce the child for a child abuse investigation. What if the child is in the home? See, this is the problem. You're creating mutually exclusive categories and the child here is in the home. The child may or may not want to talk to the officers, but clearly the mom, who's the custodial parent, doesn't want the child to see the officers. And I would say that when you have a parent who is a potential child abuser, that is an absurdity, that that parent who is the potential abuser has the right to keep the child from the investigation. Well, then you need to get a warrant and resolve the issue that way, I think, because it is occurring in the home. It was a voluntary, consensual encounter. I think the officers admit that. The mother could have left, terminated the interview at any time, and gone back into the home, and yet the mother here was arrested. That's what I'm struggling with. Right. And I think what turns this encounter into something different from a consensual encounter is when she starts to provide false information and evasive information. Now, that's interesting. So I was wondering why you didn't make that argument below or in the briefs, which is that obstruction of justice is, I mean, traditionally what we think of is lying to officers. And I think there's a pretty good darn argument that she was lying to officers. Was this abuse? No, there was no abuse. You know, who beat the child? Completely evasive and actually giving, I think, false answers, because the officer said, we have evidence, we have pictures that this happened. But you don't argue that lying alone gave them the right to arrest her? No, I'm arguing that lying was one component that allowed them to arrest her. And I believe that the statute permits the Department of Human Services to just view a child. They didn't want to seize the child. Now, we are not, you know, there's not— Where is the express authority? You said the statute doesn't prohibit, or I forget how you phrase it, I want to botch what you said, but where is the authority that an individual under Iowa law must produce a child in response to these statutes? Well, I believe when the CPW shall perform an evaluation— They can do what they want, but there's no obligation in the statute placed on the parent to do anything, as far as I'm concerned. Well, I think that that can be read implicitly into that. If a child protective worker shall evaluate the child, then, you know, then whoever is blocking that access can be held liable that— Unless it's done in a constitutionally permissive and protected way. And I believe it was. Counsel, in your own brief at page 19, it says that lack of cooperation with the police would not meet the probable cause standard in Iowa. And we have evidence in the record, and I'm quoting here. This is Detective Westlake explaining the reason for the arrest. Unfortunately, Trenicia was uncooperative, and so she's going to go to jail. Where's the probable cause? And that was probably one piece of what was— what were many things that were said by Jennifer Westlake, including that she actually felt like she was at an area where she was approaching imminent harm at that point. So she— Where is that in the record? She indicates—oh, and I've got it a couple places. Well, counsel, Defendant Westlake testified that there were no exigent circumstances justifying a warrantless entry. Yes. She said that there was—she didn't feel like there—that there was exigent circumstances to go into the house, but their concern was rising enough in terms of being able to see the child. They didn't want to bust down the doors to the home. They wanted to look at the kid. But this was an interlocutory appeal. Are we supposed to assume facts that are contrary to the record? No, I don't think that there needs to be an assumption of those facts that are contrary to the record. Jennifer Westlake speaks about, in her deposition, about how her concern began to rise as the—as mother is not producing this child, is asking or is answering in evasive ways and is actually lying about the nature of the injury. I want to ask you sort of my question again, which is, do you make that lying argument independently? Did you make it to the district court? Did you make it on appeal independent of this produce-the-child theory? Well, I — no, it was part of the same argument, that the lying was part of what created the probable cause. But you don't argue that probable cause was created merely by the lying? No. It is one factor to be considered. And just to get to the second prong of things, because I think we've primarily been arguing about the probable cause or the constitutionality of the arrest, when we get to that second prong of whether or not this is a clearly established right, there is no case law out there that is, you know, exactly on point. But we are the ones that provided the case out of the Sixth Circuit, which is as close as anything that anyone's been able to find in this case, where, again, parents said, no, we're not going to let you see the kids. And the report in that case was, well, it sounds like the kids are being hit. Well, in this case, we know that this child was hit. She's got the evidence of the injuries. And so in that case, we have as close as possible. Counsel, how do you get around Barabow v. City of Minneapolis? It's an Eighth Circuit case, 2010. And this is a direct quote. It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment. I get around that by saying that that's not a fact-specific case to this one, and that the Supreme Court of the United States, just as late as October of last year. Aren't you really telling me that that's too high of a level of generality? Yes, I'm trying to tell you that. That's panel precedent. Are we supposed to retroactively go back and redefine it more narrowly? Absolutely not. I think you differentiate on the facts of this case, that this situation was unique, that we have officers who are making those split-second decisions out there. And that's the whole point of qualified immunity, is that we want to encourage officers to act. But the split-second, it's not quite like an excessive force case here, right? The mother was arrested, and then the interview or the engagement continued, right? And eventually, consent was granted to enter the house. So it's not like a split-second decision. There was a decision made to arrest the mom, as I understand it. And then the negotiation continued. Am I getting the facts wrong? Well, the fact that she was arrested is essentially what changed Robert Rushing's response. And he opened the door, and they were able to see the child. And so it affected what the officers were trying to do, which was to actually view the child and make sure that the child was safe. Counsel, you are on rebuttal time, if you'd like to save the remainder. Yes. I'll ask just one more question. The difference between the arrest, and there was no search in this case, but wouldn't your argument be stronger if you were arguing that the officers were entering the home? I know there'd still be no exigent circumstances, but at least then you would tie up to shall produce a child. It seems to me that your argument is one step removed from that, which is mother wouldn't produce the child, so we're going to arrest her. But that doesn't get the officers to see the child, because dad was at home. And so I'm wondering if your argument is just, you say, look at the facts. Isn't the argument completely undermined by the facts here? Well, no, I would respectfully disagree, Your Honor. I think I have to. But when the Iowa Supreme Court, for example, just recently, as recently as January, looked at the Donner case, for example, that was cited by Ms. Webster, and the key question that Justice Apple in that case said is that there's a very low bar for does it hinder the investigation? Does that action hinder what those officers are trying to do? And what they were trying to do was see the child, which is, I believe, permitted under 232B, and under that evaluation standard, because they're supposed to help DHS do that investigation, part of that investigation is to evaluate the child. And in this circumstance, you know, they, those officers were, you know, attempting to carry out that statutory duty, really. And the one thing in their way hindering that investigation was Trenisha Webster. All right, thank you, Ms. Mack, and we'll give you two minutes for rebuttal. Thank you. Mr. Brown, you may proceed when ready. Oh, I'm sorry, we'll need to wipe the podium. Thank you, Your Honor. May it please the Court. Counsel, my name is Brandon Brown, and I have the privilege of representing Trenisha Webster, and we respectfully submit that the Court correctly concluded that the defendants violated her clearly established rights to be free from unreasonable searches and seizures when she was arrested for interference with official acts without even arguable probable cause. But, counsel, what if that's not the right formulation of the right that it's at issue? The appellant says that the right at issue is the right to refuse access to a victim child from officers investigating child abuse investigations. If that's the formulation of the right, then it's not clearly established because we don't have case law directly on that. Correct. But I think that is the defendant's characterization of the right because they're trying to circumvent the Constitution and the Fourth Amendment. There is no constitutional provision that requires a parent to produce a child in a criminal investigation. What you have to look at is whether there's probable cause or exigent circumstances in order to determine what law enforcement are able to do. Were there exigent circumstances here? And I'm not asking you to go back to the officer's affidavit because we don't care necessarily what the officer thought about it. We just care what the officer said about it. And could a reasonable officer under the circumstances say, mom picked up child early from school, and we have pictures showing the child was beaten? Is that enough for a reasonable officer to either have exigent circumstances or at least under the clearly established right prong make it ambiguous? Well, first of all, I know we want to set aside the fact that they offered up during their deposition that they had no exigent circumstances. They offered up. They wouldn't have went into the home under the circumstances they knew. And it's important to recognize what they knew at the time when they went to Trenisha Webster's door. They knew that the Department of Human Services, the intake case worker, had already interviewed the girl. So that has already been done. As far as going down the DH assessment, we've already had contact with the girl. We talked to the girl. Now, the next issue is taking her out of school early. Now, officers also knew that Trenisha had taken her daughter out of school early. That was aware. They were aware of that. They were also aware of the fact that Trenisha was recalcitrant when she talked to DHS the first time. So when they go up there, they have the opportunity beforehand to go and request a warrant or, excuse me, a removal order or some sort of search warrant to go into the house. They've acknowledged under oath that they did not, they had the opportunity and the time to go get the warrant, but they didn't. And they also acknowledged that there were no exigent circumstances. And really, the only thing that would apply here is there's no hot pursuit. There's no destruction of evidence. So it's really boiling down to emergency aid. Yeah, and I'm more getting at the second part of it, which is defining the right more narrowly, which is to say that, you know, it's still probably a constitutional violation, but the fact that there's picking up from school early, pictures of the abuse, some evidence of the abuse might make a, you know, a reasonable officer might make a mistake and think that's exigent circumstances. Not this officer, a reasonable officer. Well, I don't believe they rise to exigent circumstances because you still have to have an emergency and it has to be articulable. It can't be on conjecture or a hunch or some, you know, just generalized suspicion. You actually have probable cause that something is going on in that house that allows you to cross that threshold without a search warrant, without a rest warrant in order to go see that child. And unequivocally, Your Honor, there was no evidence like that in the record because if you look at the DHS assessment, they checked the box saying that there's no imminent or there's no immediate risk, there's no high-level risk here, it's a 24-hour turnaround. You know, they had the option to say this is immediate risk based on all of those circumstances. They didn't do that. They went over there and they encountered a woman they expected to encounter, someone who's going to be obstinate, someone who is not going to cooperate. But under the law, under Iowa's Interference with Official Act statute, you're not required to cooperate with law enforcement. In fact, you have to engage in actual or constructive force to the point where an officer has to take an affirmative step to engage force. That didn't happen here. Everybody acknowledges this was a voluntary encounter. Everybody acknowledges that Ms. Wester had the right to terminate that at any time, and everybody acknowledges that she didn't have to cooperate. But like the district court pointed out, even saying that she didn't cooperate really isn't supported by the record. If you look at the undisputed facts, which are largely on the body cam, seven times, seven times Ms. Wester says to Defendant Westlake, because she's distrustful of DHS, I think we all can agree with that, but she says, if we're talking about the police officer investigation, seven times, you could come in to my house and we can sit down and we can discuss this. But isn't the lying obstruction, and I think there is evidence, a reasonable officer could have thought she was lying. Now maybe, maybe the county has completely forfeited that argument, and that seemed to be the case in oral argument, but I think that a reasonable officer could have thought she was lying. I think they have forfeited it, and I'm glad you brought that up, because that's in my notes. I want to address that, because this is the first time that this has come up. First of all, Trenisha Webster wasn't the one who initiated the report. So as far as providing a false police report or obstruction, I don't believe that that even, assuming that it was a lie, would violate any Iowa law for probable cause standards, or arguable probable cause standards. But more importantly, it was a semantical distinction where Ms. Webster wasn't saying there were no injuries, she just wasn't characterizing them as injuries from abuse. She said, this is from, I can't remember her words, but essentially she said corporal discipline. That was acknowledged within seconds after she said there are no injuries. So I don't think it's fair to assume, even giving the city and the defendants the light most favorable to them, that she was lying because of the exchange that continued. You have to look at it together. So I would disagree factually that she lied, and I would also say that that argument was forfeited, and beyond that, I'm not sure even if she did, if that's a violation of Iowa law. Well, that's what I was going to ask, that last point. Suppose she did, they had preserved it. Suppose they had asked her, were you at the coffee shop at 9 a.m. when it was robbed? And she says, no, I'm not at the coffee shop. I was not at the coffee shop at 9 a.m. Video surveillance shows that she was there at 9 a.m. when the store was robbed. Is that enough? If I put my criminal defense hat on, of course I'm going to say no. But not to my knowledge, because if I could just twist a little bit, if, for example, that person called and said, so-and-so robbed a coffee shop and they didn't, that's a lie to police, but that's initiating the report of the complaint to law enforcement. So that would be a violation of Iowa law. But I think being more of a witness or asking to comment on photographs, I'm not sure that even rises to an arguable level that there would be probable cause for an arrest in that situation. Another thing, it was touched on a little bit, and that's on immunities. I know the state or the city has cited a couple of statutory immunities. First of all, I would argue that those are nothing more than codifications of a qualified immunity standard, or an exigent circumstance, I should say. And that would be an imminent danger or imminent harm standard, because you still have to establish  without a court order or a removal. So to try and rely on statutory provisions to provide immunity, first of all, you can't do it to a Section 1983 claim because of the Supremacy Clause. But if you try to apply it to the state law claims, they fail because these are merely codifications. Roberts, counsel, is there even a final appealable order as to the state law appeal? Only to the extent I think that qualified immunity would apply. But the other ones, I would agree. They're not even appealable. Another issue that was raised, that was lightly touched upon in briefing, is this idea or this notion that Iowa has a different probable cause analysis when it comes to a civil claim as opposed to a criminal claim. And I would like to discuss that a little bit, because I argue that's actually not the case. If you review the children's case that came out and was cited by the city, that case came out in the early 80s. And it was one of the state courts' first opportunity to address what happens when law enforcement are charged with a tort like false arrest. Because in Iowa, anybody can be charged with false arrest, whether you're a private actor or you're a law enforcement officer. And when that case went up on appeal, they recognized law enforcement should receive some heightened protection when engaging in their duties. So what they did is they applied this good faith, reasonable belief standard. But it's not as lower burden or as subjective as the city would like you to believe in their brief. It's actually a two-prong review. If you look at the Bivens case, which is cited in Children's, they say that it's both subjective and objective. So even though the officer has a subjective belief in good faith that they have probable cause for the arrest, objectively, you still have to determine whether or not that is reasonable. And in Iowa, 40 years of jurisprudence has established the contours for interference with official acts. And it's very clear that words are not enough. In fact, the statute 719.1 sub 3 talks about verbal harassment. And if you look at the evidence in the light most able to state, they might say there's verbal harassment here. But that's not enough. You still have to show that the verbal harassment is coupled with a person's intent and ability to execute on some sort of verbal threat. But law enforcement said there was no assaults, no risk of assaults. Tanisha didn't do anything like that. So those are undisputed facts supporting the fact that she was arrested without even arguable  RONALD DRAPER Counsel, I'd like to maybe revisit just for a little bit the issue of lying to law enforcement and whether that might create probable cause. And I'm wondering, is there a distinction between whether the person is in a situation where they're not obligated to talk to the officer or whether they're actually perhaps under arrest or there's an investigation going on? For example, if an officer in a consensual encounter says, I would like to talk to you, and the person says, no, I'm too busy, I need to get to my doctor, and that's a lie. They don't really have to. Is that illegal? RONALD DRAPER I don't believe so. Because, I mean, keep in mind, so this is a voluntary contact. Tanisha has the right to disengage at any time. But again, I think if you look at the record, you'll see that there wasn't really lying occurring here. She was merely asserting that whatever you saw wasn't an injury. An injury comes from an assault. She said this was, in my words, corporal discipline. And so she acknowledged what the officers had in their possession. So I think it's even unfair to characterize it as a lie. Let me just check my notes here. The other thing, too, is the severity of the injuries. I talked about these injuries. In Iowa, we make a distinction between bodily injuries and serious injuries. And in order for these injuries to even come into play for an exigent circumstances, they would have to be serious injuries. And serious injury, under Iowa law, is typically defined as a substantial risk of death, serious permanent disfigurement, protected, or loss of impairment or function of the body. RONALD DRAPER  For a consensual visit, but then they heard a child screaming or crying in another room, that they could go investigate that, regardless of whether it was a serious bodily injury. 100%. Because you don't know what that is. But the scream could certainly reasonably lead an officer to think that it could be a serious injury. So I would agree with that. But in this case, they didn't have screaming. They didn't have hot pursuit. They didn't have somebody calling, claiming there was arguments coming from the house minutes before or hours before, like they did in all of the cases that the city cites. All those cases where they're asking the court to recognize this right to investigate child abuse, all of those cases either involved hot pursuit or they involved an exigent circumstance where they heard screaming coming from in the house. Or they saw a child trying to climb out of the house, which gives them concern. So what does that distinction get you, though? I mean, I'm trying to figure it out. Are you arguing that if the child was beaten to, you know, within an inch of her life, and there were pictures or testimony of that, then you would need exigent circumstances to enter? That's a good question. The exigent circumstances becomes important because if the city could argue or could establish there were facts where Tranesha was obstructing or putting an obstacle in their way to go into the house when there were exigent circumstances, then that would support probable cause for So the lack of exigent circumstances gives the officers no right to enter the house, and Tranesha deciding, I don't want you to come into my house, is completely within her rights. Although, as the district court pointed out, they never even directly asked to see the child. It was more kind of inferred or suggested by their presence. So, you know, I think they still have some factual problems there, too. Without any other questions, I've reviewed my notes. I think I've covered everything that I need to, so I would yield my remaining time. All right. Thank you, Mr. Brown. Ms. Mackle, you may proceed with rebuttal after we wipe off the podium. Just a couple of points. I think it's interesting that Ms. Webster continues to try to create distinctions between the fine-out case and this case because we don't have a case that has exactly the same factual scenario as we have here. But that's not what the Supreme Court requires. It requires something factually close. And this is the only case that is factually close. And in that case, those parents were also arrested for interference with official acts. And the Sixth Circuit found that there was not a clearly established law and said that, therefore, there was no liability to the officers for that arrest. That is the only case we have guiding police officers in this kind of situation. And so, the second prong most certainly falls in favor of our officers. And so, to say that that case is slightly different, well, fine. Then produce something that's closer. And they have not been able to do that. And so, for that reason, the second prong of qualified immunity analysis falls within our favor. And you don't think the fact that there, there were exigent circumstances, I know, I think this has been brought up earlier, that that doesn't make it materially distinguishable to the point where it's not helpful. Yeah, I think it's actually less in terms of exigent circumstances. Somebody called and said they thought a child was being hit. Well, what does that mean? I mean, a child being spanked, that's not exigent circumstances. The house had a red tag on it. Well, that's, that's not exigent circumstances. And so, and so, in this circumstance, and I don't think there's been a case that says, you know, in terms of child abuse, you know, there has to be, you know, you have to be able to go into the house in order to arrest mom for interference when she's refusing to produce the child. And, you know, that's why we, we have qualified immunity. So we're not asking officers to trade safety for their own self-preservation. And for that reason, we ask the court to find in favor of the officers. Thank you.